Our next case for argument is Interstate Fire & Casualty v. Apartment Management Consultants. Good morning. My name is Rex Heinke. I'm here on behalf of the Appellant Interstate. There are two fundamental points that we would like to make this morning. The first one is that Interstate did everything it needed to do as an excess insurer to inform AMC of the reservation of rights. The American rule is quite clear. If you are an excess insurer, you have no duty to do anything about reserving your rights until the primary insurance has been exhausted. In short, you're not at bat. The primary insurer is at bat. When the primary insurer's policy has exhausted you, the excess insurer steps up. And then you have a duty to defend, and you have a duty at that point to take over the case. So even if you're the same insurer and you're the primary and the excess, a different rule applies to you as an excess because of what you just described. Yes, Your Honor, and that's what all the cases hold. The only cases that have discussed that have adopted that rule. There are no contrary cases that adopt a different rule. So you concede that with respect to the primary policy that estoppel applies? No, I don't. That's my second point. Okay, so we're coming at this from the back end. Because there is no contrary law. Interstate sent the reservation rights letter even before the primary policy was exhausted. So there's no argument that it was untimely. There are no contrary cases, and the only thing that AMC says here is, well, this is a form follows policy. That means that the excess follows the primary policy. We agree with that. The primary policy prohibited punitive damages. The district court did not say the primary policy doesn't prohibit punitive damages. It said you're stopped from asserting that. But that doesn't change the fact that it prohibited them, and that the excess policy followed that. And that, I submit, is the straightforward, easy way for the court to resolve this case without having to get into the other issues. But let me turn to those other issues. The estoppel question. It wouldn't resolve the whole case. It would only resolve as to excess coverage. Right, but there isn't any other coverage at issue. The primary coverage has all been exhausted. So there's nothing else to talk about except the excess. So it would resolve the entire case, Your Honor. Now, the second issue is the issue that relates to estoppel. Our position is basically... Does this matter if the primary policy has been exhausted? Does it matter whether we have estoppel as to the primary policy? No, Your Honor. If you accept what I said about the excess, that's the end of the case. It doesn't matter what happened. You don't have to get into all those issues. Interstate did what it had to do, as the excess policy holder offered the insurer, and that's the end of it. You're now arguing this so that the excess policy doesn't get tagged with the estoppel towards the primary. Well, I'm arguing it because if you don't accept the argument I just made, then the district court said, well, you're estopped as an excess from contesting the punitive damages, and we say that the district court was mistaken about its estoppel ruling. Fundamentally here, what we believe the district court did wrong is it applied equitable estoppel instead of primary... Sorry, not primary, promissory estoppel. That's what the difference here is. And you're getting to that by the court's side of that doctor's case? Yes, Your Honor, exactly. Well, okay, go ahead. Well, the only case that AMC and the district court relied on that is a Wyoming Supreme Court case is the doctor's case. And if you look at the doctor's case, it's very clear, and it says so, that it draws a distinction between equitable estoppel and promissory estoppel. But the district court quoted doctors for a different proposition. It was quoting doctors for whether there had been an effective reservation of rights. I understand. And comparing the language used by the insurance company to reserve rights in doctors with the language used here. Well, the district court's position was not that the language was ineffectual here. The district court's position was that it was too late. I know that, but what I'm talking about is you're trying to say because the district court cited doctors, we can assume that the district court was somehow confused about whether it was looking at promissory or equitable estoppel. But my point is that isn't what the court cited doctors for. I understand that, Your Honor, but my point is simply that if you read doctors, it clarifies what Wyoming law is. It says there's equitable estoppel and there's primary estoppel. And then it goes on to say that in the doctor's case, it was a primary estoppel case. I'm sorry, promissory, Your Honor. And I guess my response to that is, so what? So what is, it distinguishes the other Wyoming cases that say no equitable estoppel. It says those cases say under no conditions can the insurance policy be expanded. Those are equitable estoppel cases, and that's the law in Wyoming. However, if you have promissory estoppel, then you have a new agreement. And therefore, the person who detrimentally relies on the promise is entitled to do that. Our point is, therefore, equitable estoppel under Wyoming law cannot expand the scope of the policy. Promissory estoppel can expand the scope of the policy. And so you're thinking here that the court cites doctors and ultimately concluded that coverage is expanded here under promissory estoppel. Is that what you think the court said? No, I don't think the district court said that. I think what the district court, the district court ignored what doctors said. The district court said that equitable estoppel, there was equitable estoppel, and that's enough to expand coverage. Our position is that's mistaken. You cannot expand coverage based on equitable estoppel. You can expand coverage based on promissory estoppel. But don't we get away from doctors and the ultimate conclusion by the court when we look at how it cites and refers to Cornhuskers? Cornhusker, that decision? Yes, Your Honor, and if you look at Cornhuskers, we think that there are three important things about Cornhuskers. Really, if you look at the facts of the Cornhuskers case, it too, and admittedly the court doesn't say this, but it too is really, truly a promissory estoppel case. Because what happened there was the insurer said to the insured, we'll represent you. And then the insurer let a default be taken against the insured. And then the insurer didn't tell the insured that this had happened for 16 months. So the insured relied understandably on what had been told by the insurer, and the insurer didn't perform. Well, don't we have reliance here as well? I mean, the idea of providing a defense, and so the insured says, okay, I guess this is what you're doing. We keep talking to you and asking you to do things, but you're saying it's okay, we're going to just plug along. Well, there are two things the insurer agrees to, a defense and indemnification. Yes, we promised a defense here, and we provided a defense. We provided a vigorous defense that finally reduced the $25 million in punitives down to $1.95 million. So there's no question that we provided a defense. But didn't pursue requested, that is from the insured, the requested urgings to settle the case within policy limits. Yes, that's what they said, and below they sought bad faith damages, bad faith tort against us on the grounds that we had not settled when we should, and the district court rejected that because it said nobody believed there were going to be punitives in this case, and so it was quite reasonable to reject the offer of settlement. So to the extent that AMC is saying, well, we were prejudiced because of this, the district court has rejected that argument squarely. I was just trying to get to the point of your fulsome defense and whether it was in fact fulsome. I get your point. When you get right down to it, our position is the only way you can extend the coverage is by promissory estoppel, and there was no promissory estoppel here because there was no detrimental reliance on anything. And no prejudice, you argue. And no prejudice. Where is the evidence of prejudice? The judgment. The judgment is not evidence of prejudice because prejudice would have. There's a lot of money that they have to pay. Well, no, that's not prejudice. Prejudice has to be that they were hurt by not getting the reservation of rights letter earlier. That has to be the prejudice. And the district court viewed it as I just described it, right, to say there is prejudice because of the judgment entered. Yes, that's what the district court held. We submit that that is completely wrong. In fact, if you look at this court's decision in the Evanston case, this court squarely rejected the argument that sending out a reservation of rights letter that was arguably late amounted to prejudice. This court squarely held that is not the law. And there are lots of other. Well, but in that case there was evidence that the insured was satisfied with counsel that we don't have here and that the insured rejected an opportunity to settle within policy limits. Well, but there's no evidence here that AMC was unhappy with the counsel. Well, the argument is that when you provided the defense that I didn't have an opportunity then to go get my own counsel. But you could have. Nothing prohibited them from getting their own counsel. And once they got the reservation of rights letter, they didn't get their own counsel. They never showed that they would have gotten the counsel at any time. They never did it throughout the case. The reservation of rights when finally voiced was what, 11 days before trial? Correct. That's sort of late to run out and get new counsel in a case like this. Well, but you could have gotten counsel post-trial. You could have gotten counsel on appeal. They had plenty of time to do that. Well, post-trial, I mean, they'd already had their injury, right? There was a big award. The question is, would independent counsel have changed that? And there's no evidence that independent counsel, A, would have been hired. They weren't. B, that they would have done anything different than the counsel who defended the case. Or C, that those counsel would have somehow made a difference in the outcome of the case. There's just no evidence of prejudice here. I'd like to reserve my two minutes, if I may. In my age, Your Honors, I need to have the papers as close to my eyes as I can get them. I appreciate that. May it please the court, counsel, my name is Chuck Spivak, and I represent apartment management consultants, the appellee in this matter. I'd like to tailor my argument to the questions that the court asked and the arguments that were made by counsel in the beginning. And I will start with this issue about whether this is only about the excess policy. And whether the excess policy, in fact, for sure provides no coverage, because it didn't have to reserve rights. And that's true, isn't it? I mean, the case law is pretty uniform that you don't even know if your excess policy has been triggered until you know you have an excess liability, right? This case is different, Your Honor. This case is different because the excess policy in this situation doesn't contain an exclusion for punitive damages on its face. Well, an excess policy almost always just picks up all of the exclusions from the primary policy, as this one does. So the way I read the excess policy, because it has an incorporation by reference of the exclusions, is that it indeed does have an exclusion for punitive damages. Why is that wrong? It's wrong, Your Honor, because in this case it only picks up the exclusions in the primary policy if the exclusions in the primary policy are valid, enforceable, and can be applied consistent with the coverage in the excess policy. Show me where in the excess policy the language is that you're relying on for that interpretation. I know it's quoted in our brief, Your Honor, it's in the language of the excess provision itself that specifically says that the provisions within the primary policy have to be able to be interpreted consistently with the language in the excess policy. And here's the fallacy of the argument, and Your Honor picked up on this in indicating that this was a tower of coverage all provided essentially by the same insurance group. The argument here is that there's an exclusion in the primary policy, which we argue and which the trial court below concluded that primary carrier cannot rely upon because it is stopped from relying upon that provision. Yet the argument would be that it can still be interpreted into the excess policy because the excess policy follows form. But this would result in a situation where the primary policy would provide coverage and the excess policy would not, and that would be an inconsistent application of the assumed terms. Would you put the opposite where the primary policy doesn't provide coverage? I'm sorry, it does provide coverage because it's waived, but there's no waiver or estoppel as to the excess policy. What's wrong with that? What's wrong with it, Your Honor, is that how can you interpret into, how can you follow the form into the excess policy, a provision that is not enforceable in the primary policy to which it follows form? Because the excess policy incorporates those exemptions. It's a contract interpretation. It's an incorporation by reference, but there's nothing in the excess policy that incorporates waiver, estoppel, other equitable defenses to the primary policy. That doesn't seem difficult to me. So, Your Honor, the arguments of waiver, equitable estoppel are not a matter of policy language in the primary policy. They're a matter of conduct that results in the invalidation of a provision in the primary policy. What didn't invalidate the provision? It said you're stopped from relying on the provision. It invalidated that provision for application in this particular case. And thus, with regard to the excess policy. For application as to that policy, what if we had different insurers here? Would you be arguing that the estoppel as against one insurer on the primary policy can be also applied to the excess insurer? If it's a different insurer? That would have to be the result in a situation where the excess insurer is only able to exclude punitive damages by reliance on a provision in the primary policy which it follows from. Your Honor, could I bring something else up that I think answers this on the basis of the factual record as opposed to the intellectual exercise that we've been engaged in? The trial court pointed out with regard to the manner in which this defense was being conducted, that it wasn't just being conducted with regard to what was being told to the policyholder regarding the primary policy. The defense counsel that was hired by the insurer in this case, when approaching the insurers asking that they consent to the dual representation of what was then the two $75 million tower of coverage, including the $75 million in excess coverage, as justification for the requested consent to the dual representation. So in this situation, the argument is, you know, we never needed to tell you anything about the excess policy because its obligations weren't triggered yet. So a waiver and estoppel can't apply to the excess policy. Well, in addition to the argument that that can't exist in a situation where the excess policy doesn't contain the term itself that the primary policy is a stop from applying, in this particular case, the manner in which the defense was conducted without reservation of rights involved a situation where that retained defense counsel referenced the entire $75 million in excess coverage as the justification for his requested consent to the dual representation of the defendant's AMC in Sunridge. And in the record, Your Honor, this is in the trial court's opinion. It's document 141 of the trial court record, exhibit 13, and it's at page 88 of the appellate documents 01010127699. When you're arguing that the excess did not exclude punitives, that's not how the district court ruled, is that right? The district court went off on estoppel. No, the district court ruled with regard to the primary policy that there was estoppel. The district court then said with regard to the excess policy, there's no exclusion in this policy your own, and you can't rely upon the All right. So you're cutting those decisions in half then. You're saying the estoppel did not bleed over into the excess policy. Yeah, I'm saying that the reason the excess policy does not provide coverage is because without an exclusion of its own, it cannot rely upon a provision in the primary policy that the primary itself is a stop from asserting. And then again, I would not minimize the fact that this whole case rests on the fact that this defense was conducted without any reservation of rights. And because there was no reservation of rights, when the retained defense counsel came to these two defendants at the time and said, look, I should be able to represent both of you, it wasn't just referencing the primary coverage for which no reservation had been issued. It justified the request that there could be dual representation on the representation that there was $75 million in excess coverage available. Now, your Honor, also... I mean, I just don't see that the waiver of a conflict over dual representation that is intended to deal with all potential liability somehow means that the excess carrier had a duty to reserve before the excess policy was triggered. Your Honor, the thing that's really interesting about this argument is that the reason that it started the appellant's beginning and the reason they're now focusing on it now is because they can say that they exhausted the primary policy paying other things, thus the excess policy is the only one that's left to apply. And the argument being that... Well, the primary policy, part of it was the appeal, right? Part of it, say that again? Was the appeal. Sure. Which was very successful. It was successful, Your Honor, no doubt about it. Now, with regard to this argument, however, they're saying that the excess policy didn't need to step forward and say anything. Yet what has happened in this case is that the primary policy is now gone, only leaving the excess policy with them now making the argument that we didn't need to say anything with regard to the excess policy, because at the time we still had some primary limits available. Yet again, Your Honor, it's recognized in the record, and the trial court picked up on this, that it was the existence of the entire tower that was used as the justification for the defense being provided without reservation to convince the parties that a dual representation without representation could be provided. But the bottom line on this still is that if you have an insurance policy that does not contain a term itself, but instead adopts the term from another insurance policy to which it follows form, if that insurance policy to which it follows form cannot rely upon the term, then the excess policy cannot consistently rely upon that same term. Are you disagreeing with the district court's ruling? Not at all, Your Honor. The district court said very clearly with regard to both the primary and the excess that the primary, which contained the punitive damages exclusion, cannot rely upon it because it's equitably stopped from doing so. And with regard to the excess policy, it said that it doesn't have that term in the policy itself, and it cannot interpret that term as being part of its policy because that term no longer is applicable to this case under the primary policy. Your Honor, with regard to the prejudice argument, the point that needs to be made with regard to prejudice is that it doesn't flow from the insured's lack of knowledge of the policy's exclusion, and it doesn't necessarily flow from whether the insured could have done something differently. What this court said in Kornhusker is that prejudice is presumed to flow from the insured's actions in unconditionally controlling the defense under a reservation of rights. What this court said in Kornhusker is that we cannot ignore the possibility, even if arguably remote, that prejudice is lost because the insurer's actions in unconditionally controlling the defense under a reservation of rights. Now, in this case, the reservation of rights might have been issued before trial, 11 days before trial, but still it might have been issued before trial, but it still came after the opportunity to keep punitive damages from the jury was lost by way of the dispositive motions. Because in this case, as you recall, the only attempt that was made to try to keep punitive damages out of the case was one sentence in the dispositive motions, and the time for making those dispositive motions expired long before the issuance of the reservation of rights letter. Well, does it matter if there was no reason to believe that punitive damages would have been kept from the jury? I mean, the prior appeal upheld significant punitive damages against AMC. It did. But as this court indicated in Kornhusker, we're going to presume that prejudice exists when you take over the defense without a reservation of rights. Because in the alternative, you're asking to engage in exactly this type of discussion we're doing now, where you're picking mitts over the specific facts. A reservation of rights may have been issued before trial, but it came after the opportunity to keep punitive damage from the jury on dispositive motions. And even though punitive damages were reduced on appeal, the $22.5 million unbonded judgment that this insured faced put it at significant risk. But more important, what this court said in Kornhusker, is that the better rule places the burden not on the insured to prove prejudice, but on the insurer to thoroughly investigate the policy and notify its insured before assuming the defense that it is reserving rights to contest coverage. Your Honors, in the time I have remaining, I want to point out something that's contained in the appellant's reply brief that really points out the fallacy of their position in this case. They say, there is ample reason to believe that the Wyoming Supreme Court would conclude that an insurer that unmistakably and that mistakenly fails to reserve its rights, but fulfills its duty to defend, should not be required to pay for a loss that is expressly excluded from the policy and not paid for by the insured. Well, in other words, what they're saying is that so long as we control your defense, we never have to tell you that a portion of the claims against you aren't going to be paid. We could wait until the sheriff comes knocking on your door with a garnishment and only then tell you that we're not going to pay a portion of this judgment because, their argument goes, under no condition can we be stopped from relying on a coverage limitation. This is absolutely backward reasoning. It's precisely because the insurer unconditionally controlled the defense that the limited exception of no coverage by estoppel rule embraced by this court in the Pendleton-Cornhusker decisions exists and would be considered to be the law of the state of Wyoming. And so that is the prejudice, is the total acceptance of responsibility to defend. That's exactly right, Your Honor. It's not per se, yes, they were prejudiced because, or your client was prejudiced because of the judgment entered. No, the prejudice... I mean, that's the end result, but that really isn't the key prejudice. I see my time is up. This is exactly what this court said in Cornhusker. You don't have to prove that there was a big judgment or that there was an argument that wasn't made. You don't have to prove a legal malpractice case within the context of an insurance coverage case. What this court in Cornhusker said is that prejudice is presumed to flow from the insurer's actions in unconditionally controlling the defense without a reservation of rights. That's the issue. And that ruling has to flow into the excess policy because the excess policy contains no exclusion on its own on which the excess carrier could rely. Thank you, Your Honors. With regard to the question about Cornhusker and presumed prejudice, I would direct the court's attention to the most recent decision by this court on that issue, and that's the Evanston decision. And the Evanston decision squarely rejects opposing counsel's argument and distinguishes Cornhusker, Pendleton, and Braun, the cases that AMC relies upon. Evanston squarely held that there is no presumed prejudice by failure to give a timely reservation of rights letter and that the insured has to show prejudice. And there was no showing of prejudice here. All that AMC says is we didn't get to control the defense, but they don't show that if they'd controlled the defense, anything different would have happened. That's sort of a hard one to prove, but I get your point. Well, the trouble is, Your Honor, and I think Evanston makes this very clear, that you need some showing of that and you need it because it feeds back into detrimental reliance. The way they prevail here, if they could prevail, is to show detrimental reliance. To show detrimental reliance, you must show that you got a promise and that you detrimentally relied. They didn't do anything. They didn't detrimentally rely. They just sat there and waited the outcome of the case. So there's no detrimental reliance here. And that's why I submit that the district court's decision was fundamentally wrong. It went off on equitable estoppel and just said if you don't send the reservation of rights letter, that's the end of it. That is completely contrary to the notion of detrimental reliance, where you have to show that there was detriment because you relied. And I think that is the answer to this case, or the second answer to this case. The state fulfilled all its duties as an excess carrier. It gave notice of its reservation of rights before it even had to do so. And that should be the end of the case. But if not, the end of it is there was no detrimental reliance proven here. There was no prejudice shown of any sort or kind. Thank you. Thank you. Thank you both for your arguments. Your case is submitted. Our last case for argument.